## PIEDMONT COTTON MILLS *v.* GEORGIA RAILWAY AND ELECTRIC COMPANY.

1. Under the facts of this case, the plaintiff was not estopped from seeking to enjoin the defendant as prayed in its petition.

2. Where a railroad company has the right to condemn private property for public uses in the construction and operation of its road, it has a large discretion in the selection of a location for its route over such property; and unless such discretion has been abused, it will not be controlled or interfered with by the courts.

(a) Upon the trial of a case wherein the owner of the property through which it is proposed to run such road complains that such discretion of the company has been abused by it, it is error to exclude testimony relevant and material upon the issue as to whether or not the company has acted in bad faith in the selection of such location.

(b) Where the route selected and sought to be condemned by such company for the location of its road ran near the cotton mill of the owner

9

of the land, who introduced testimony to show that another route over such land was equally as practicable, feasible, and advantageous to the company and the public as the one selected, and that it contemplated in a short time making an enlargement of its mill, the plant of which was originally designed and constructed with the intention of subsequently making such enlargement and would have been designed and constructed at less cost if such intention had not existed, it was error to exclude testimony offered for the purpose of showing that such company acted in bad faith in selecting the route it did select, to the effect that the portion of the land over which such route was selected was the only location on such land on which its mill could be scientifically and economically enlarged, and that to enlarge the plant at any other location on said land would necessitate the building of a new and independent mill which could not be operated in connection with the existing plant.

3. A party having the right of condemning private property for public purposes can only condemn such amount thereof as is useful, needful, and necessary for public purposes.

(*a*) If such party, in condemnation proceedings, makes an effort to condemn more land than is necessary for public purposes, as the assessors in such proceedings can only determine the amount of compensation to be paid, the owner of such land has the right to have a court of equity intervene and enjoin the condemnation of such of his land as is not necessary for public purposes.

(*b*) Where a party has a right to condemn land for public purposes, it is not confined to such quantity as may be absolutely necessary or indispensable for public purposes, but such quantity as may be reasonably necessary may be condemned.

4. Upon the trial of a case wherein the owner of land seeks to have a party having the right of condemnation enjoined from condemning his land, it is not error to admit testimony of such condemnor that he made an effort, before instituting such condemnation proceeding, to acquire by contract the property sought to be condemned and failed in such effort.

5. Suburban and street railroad companies incorporated under the general law pursuant to the Civil Code, § 2180, have power to condemn private property outside of the limits of incorporated towns and cities. (HOLDEN, J., dissents.)

Argued November 23, 1907.—Decided July 24, 1908.

Petition for injunction. Before Judge Ellis. Fulton superior court. September 21, 1907.

*Owens Johnson, H. L. Culberson,* and *Dorsey, Brewster, Howell & Heyman,* for plaintiff.

*Rosser & Brandon* and *Walter T. Colquitt,* for defendant.

HOLDEN, J. The Georgia Railway and Electric Company, the main defendant in this case, was incorporated as a street and sub-

urban railroad. After obtaining its original charter, it sought and obtained from the secretary of State an amendment thereto, purporting to give it the right to run a branch line from East Point to Hapeville through the property of the plaintiff and others. It attempted to condemn the property of the plaintiff, which filed an equitable petition to enjoin the defendants from condemning, and the defendant Georgia Railway and Electric Company from taking, a right of way through the property of the plaintiff. To the order of the court refusing an interlocutory injunction the plaintiff filed exceptions.

1. The evidence shows that the defendant undertook to buy from the plaintiff a right of way through its property, and negotiations were had between them to this end. After these negotiations were at an end, the defendant sought to have assessors appointed and a right of way condemned. One assessor was appointed by the plaintiff and one by the defendant, and upon the failure of these assessors to agree upon a third one, the court appointed the third assessor. These assessors met and adjourned to a subsequent day fixed by them, on which date plaintiff filed its application for an injunction and obtained a temporary restraining order. There was evidence that the defendant had built its line of railway from Hapeville on one side, and East Point on the other, almost if not quite up to the plaintiff's property. The evidence of the general manager of the plaintiff, who had charge of the matter for the plaintiff, was that he always proceeded in the matter on the information that the plaintiff could not do anything whatever in staying any purpose of the defendant, and that it had a right to run its right of way through the mill if it so desired, and that it was only recently and just before the petition for injunction was filed that he learned that the plaintiff had any redress. It does not appear from the evidence in this case how much work was done by the defendant on its line from Hapeville and East Point towards the property of the plaintiff after the plaintiff had knowledge of the fact that the defendant contemplated running its right of way through the property of the plaintiff; but even if it disclosed how much work was thus done, it does not appear from the record in this case that the defendant did any work on the faith of anything done or said by the plaintiff's officers, or that the defendant was misled thereby. There being no

evidence of intentional deception on the part of the plaintiff, or any conduct which actually misled the defendant, the plaintiff would not be estopped from asserting any of its legal rights in the injunction proceedings.   Civil Code, §5152; *Tinsley* v. *Rice,* 105 *Ga.* 285, 290 (31 S. E. 174); *Evans.*v. *Napier,* 111. *Ga.* 102, 105 (36 S. E. 426); *Starr* v. *Newman,* 107 *Ga.* 395 (33 S. E. 427); *Thornton* v. *McDonald,* 108 *Ga.* 3 (33 S. E. 680); *American Freehold Co.* v. *Walker,* 119 *Ga.* 341 (46 S. E. 426).

2.   The plaintiff alleged that it originally erected a cotton mill of a stated capacity, which it had since increased, and that it had purchased more land for the purpose of making still further additions to and enlargements of its plant, and contemplated in a short time making such enlargements and additions.   The plaintiff further alleged that the place where the defendant seeks to locate its right of way is the only place where such enlargements and additions can be made to the original plant so as to be operated under the same heads of departments, and so that the same steam plant used in connection with the original mill could be used in operating the machinery added, and that the power-house of the original mill was originally built with a view to housing such a steam plant as would operate such additions as might be made. It contended that if the additions and enlargement of the original mill were not made at this place, but at some other place on its property, it would be the same as if it were to erect a new and independent mill, and, owing to various reasons set forth, it would derive no benefit from it as an enlargement and extension of the original mill.   The plaintiff further alleged, that the physical formation of its land was such that the defendant could locate a right of way at a different place, which, as far as concerns the defendant and the public it serves, was just as feasible, practicable, and advantageous a route as the one it sought; and that this route would be the same to the defendant and the public in every respect except that it would be about 30 feet longer, and would have a slight curve therein.   The plaintiff contended that the defendant's location of its right of way at this particular place that was needed by the plaintiff for the enlargement of its mill was done arbitrarily, capriciously, and without reason or justice.   The defendant denied all of these contentions of the plaintiff, and offered proof to show that the route selected by it was the only practicable, feasi-

ble and advantageous route, and that any other route over the plaintiff's property, by reason of the curves such other route would necessitate, would make it dangerous to operate its cars; and offered proof in support of its denial of the other contentions. The plaintiff offered, in support of its contention that the enlargement and addition to the original mill could not be located at any other place on its property than that over which the defendant sought a right of way, without great loss and irreparable damage to the plaintiff, the following testimony of four witnesses who had qualified as experts: "The only place where the new building for the proposed addition to and enlargement of the plaintiff's manufacturing plant, having any intelligent and scientific reference to topography and the lay of the land and the situation of the buildings now on the ground, is the place indicated on the drawing hereto attached, marked 'new building.' . . If the new building contemplated by said plaintiff were located elsewhere than at the place indicated, a new steam plant would have to be housed and installed, and a new plant from A to Z built, in order to enable the plaintiff to increase its output. . . The insurance regulations in such cases require that the buildings should be the distance apart that they are shown to be on said plat. . . Deponent says that if the railroad is allowed to be built and operated through said site of said new building, it will be simply destructive of the plaintiff's mill site, so far as any intelligent and scientific addition to or enlargement of the plaintiff's present factory are concerned. . . While the plaintiff, or any other person or company, could go out and secure a piece of land and locate a cotton mill thereon, if a railroad is to be built and operated through and over the place indicated in the drawing hereto attached, the plaintiff will have no place to add to its present mill, and the present mill will be condemned, for all time, to practically its present capacity."

Where a railroad company has the right to condemn private property, it has a large discretion in the selection of a location for its right of way. 15 Cyc. 634, 635; 1 Rorer on Railroads, 281; 1 Lewis on Em. Dom. (2d ed.), §279, p. 675; 3 Elliott on Railroads, §919, p. 1264; 10 Am. & Eng. Enc. Law (2d ed.), 1057; *Savannah R. Co.* v. *Postal Telegraph Co.,* 112 *Ga.* 941, 945 (38 S. E. 353) ; *Georgia R. Co.* v. *Maddox,* 116 *Ga.* 64, 68 (42 S. E. 315). The mere fact

that another location would be equally as feasible, practicable, and desirable would not of itself be sufficient to force the company to change to such location and abandon the location selected. If the company could be made to do this, it might have difficulty in ever securing a location where there existed over the property of one or different persons various routes equally as practicable, feasible, and desirable. A large discretion is vested in a party having the right to condemn, in the selection of the particular property to be condemned; and such selection should not be interfered with or controlled by the courts, unless made in bad faith, or capriciously or wantonly injurious, or in some respect beyond the privilege conferred by statute or its charter. 15 Cyc. 634, 635; 10 Am. & Eng. Enc. Law (2d ed.), 1057. Where any person is given by law the right to exercise a discretion, and abuses such right, the courts may interfere. If the defendant in this case, in the exercise of the discretion given it in the selection of a route for its right of way over the plaintiff's property, acted in bad faith, then the courts would have the right to interfere. One of the contentions of the plaintiff in this case is that the defendant acted in bad faith in the selection of its route; and the plaintiff offered evidence to show that another route through its property was just as feasible, practicable, and advantageous as the one selected. The plaintiff also offered evidence to show that the route selected by the defendant went through that portion of the plaintiff's property which was the only part thereof whereon it could scientifically and economically enlarge its mill. The evidence hereinbefore set out, offered for the purpose of showing these facts, was rejected by the court. If there was over the plaintiff's property a route which the defendant could take, equally as practicable, feasible, and advantageous as the one selected, and if the appropriation by the defendant of the one selected would have the effect of preventing the plaintiff from enlarging and adding to its mill in a scientific and economical way, evidence of this latter fact, in connection with the other testimony in the case, would be admissible to illustrate the question as to whether or not the defendant was acting in bad faith in selecting this particular route; and we think the court committed error in excluding this testimony. There was some testimony before the court, offered by the plaintiff and the defendant, upon the same subject as that embraced in the testi-

mony excluded; but the testimony of these four experts being excluded by the court and not considered by him upon the trial of the case, it is impossible for this court to determine what effect such testimony, if admitted, in connection with the other testimony in this case, would have had upon the court in deciding one of the questions at issue. Under the Civil Code, § 5287, the testimony of these experts was admissible; and for the reasons above announced, the ruling of the court below in refusing to admit it was error.

3. Another contention of the plaintiff was that the defendant sought to condemn more land than was necessary for its use. The testimony of the plaintiff was that a strip of land 20 feet wide would be sufficient for a single track and a strip 30 feet wide would be ample on which to lay and operate double tracks, and a strip 60 feet wide would accommodate four tracks. This testimony was undisputed. It does not conclusively appear that the defendant only wanted to lay one track, but, taking into consideration all of the evidence in the case, it would seem to indicate that its only purpose and desire was to lay one track. The notice in the condemnation proceedings stated that the defendant desired to condemn the land for several purposes besides that of simply running a road through it, but in its answer it does not refer to these other purposes, and it nowhere appears in the testimony that the defendant desires to do anything except to operate a line of railway through the property, and the testimony indicates that it only wishes to operate on one track. The engineer Smith, who testified for the defendant, attached as a part of his affidavit a map which shows the right of way sought to be condemned through the property of the plaintiff; and this map indicates by a single center line where the defendant proposed to lay its track through the property of the plaintiff, and also shows such single center line to extend on to the property adjoining that of the plaintiff on either side. However, there is no testimony conclusively showing that the defendant only desired a right of way for one track, but the only testimony in regard to the matter indicates that it only desired land for one track. It does not appear that the defendant offered any testimony to show how many tracks it expected to lay, or how much land it needed, or the purposes for which it needed land. The plaintiff in its amendment to its peti-

tion states that the defendant sought to condemn more land than it needed, or was necessary, and in support of this contention introduced testimony that the strip of land 60 feet wide sought to be condemned was enough to accommodate four tracks of the defendant. If it be true that the defendant only needs land for the purpose of operating one track, or indeed any number of tracks less than four, the testimony shows, without contradiction, that the amount of land sought to be condemned is more than it needs and is more than is necessary. A party having the right to condemn private property can only take such property as is useful, needful, and necessary for public purposes. Civil Code, §4658; *Savannah Ry. Co.* v. *Postal Telegraph Co.,* 115 *Ga.* 554, 560 (42 S. E. 1); *Atlantic Railroad Co.* v. *Penny,* 119 *Ga.* 479, 481 (46 S. E. 665); 10 Am. & Eng. Enc. Law (2d ed.), 1057; 15 Cyc. 632, 633, 637. In condemnation proceedings the assessors can only determine the amount of compensation to be paid; they can not determine whether or not the quantity of land sought to be taken is necessary for public purposes. *Atlantic Railroad Co.* v. *Penny,* supra. When an effort is made to take more land than is necessary for public purposes, the owner of the property sought to be condemned has a right to ask the courts to intervene. *Savannah Ry. Co.* v. *Postal Telegraph Co.,* supra; *Atlantic Railroad Co.* v. *Penny,* supra. The taking of more land than is necessary for public purposes can not be justified on the principles underlying the right of eminent domain. When more land is taken than is necessary for public uses, it is in effect a taking for private use, or for no use; in either of which instances the right does not exist. The railroad company has the authority in the first instance to judge of the matter as to how much land should be taken; but if it should appear that the land sought to be condemned is more than is necessary for public purposes, then the amount should be reduced by the courts to such amount as is necessary for public purposes. We do not mean to say that the company is limited to the amount that is absolutely necessary, but it is limited to the amount that is reasonably necessary under all the facts and circumstances regarding the particular matter under consideration. The word "necessary" is not meant to be used in the sense of "indispensable." Necessity for public use is not such an imperative necessity that would render the construction and opera-

tion of a railroad impossible without the amount of land in question. 15 Cyc. 633; 10 Am. & Eng. Enc. Law (2d ed.), 1057. We do not hold, under the evidence in this record, that the court below abused its discretion in refusing to enjoin the defendant on the ground that it was seeking to condemn an amount of land in excess of what was reasonably necessary; but in view of the entire record in this case, and the ruling made in the previous division of this opinion, we think there should be another hearing, and upon such hearing the court below can hear evidence upon this question and exercise its discretion under the evidence submitted and the rulings we have made above.

4. The court admitted in evidence, over the objection of the plaintiff, testimony of the manager of the defendant company in regard to negotiations with the plaintiff having in view the acquirement by purchase of the right of way which the defendant afterwards sought to condemn. This testimony was objected to on the ground that it was irrelevant and immaterial, and because the negotiations were had with a view to compromise and settlement between the parties. We do not think this testimony was subject to either of the objections named. It was admissible for several purposes, one of which was to show the bona fides of the defendant in undertaking to locate its right of way at the particular place in question. This testimony was also admissible by reason of the fact that it was proper for the defendant to seek to obtain the land by contract before undertaking to condemn it. Civil Code, §§ 4658, 4659, 2170; *Bridwell* v. *Gate City Terminal Company,* 127 *Ga.* 520, 535 (56 S. E. 624, 10 L. R. A. (N. S.) 909); *City of Elberton* v. *Hobbs,* 121 *Ga.* 750 (49 S. E. 779). Indeed, it was necessary for an effort to be made to obtain this property by contract before instituting condemnation proceedings.

5. One of the main contentions of the plaintiff is that the Georgia Railway and Electric Company has no power, under the law, to condemn private property for public purposes outside the limits of incorporated cities and towns. The writer is of the opinion that it has no such power. All of the members of the court, except the writer, are of the opinion that it has such power. The views of the writer on this subject appear later in this opinion. The views of the other members of the court upon this subject, as prepared by Mr. Justice Lumpkin, are as follows:

In 1892 an act was passed for the purpose of carrying into effect article three, section seven, paragraph eighteen, of the constitution, in so far as it related to the issuance and granting of corporate powers and privileges to railroad companies by the secretary of State. It made provision in regard to the incorporation, organization, and powers of railroad companies, including the method of acquiring rights of way by purchase or condemnation. By section 16 of that act it was declared that "The provisions of this act shall not apply to and govern in the incorporation, control, and management of suburban and street railroad companies." Acts 1892, p. 37 et seq. In 1894 an act was passed which declared that the 16th section of the act of 1892, above quoted, was repealed, and that, in lieu thereof, the following was inserted as section 16 of said act, "and shall become a part of said act and of the general law of this State governing the incorporation of railroads, viz.: 'All the provisions of this act shall apply to and govern in the incorporation, control, and management of suburban and street railroad companies, in so far as the same are applicable and appropriate thereto. Any number of persons, not less than ten, who desire to be incorporated for that purpose, may form a company as provided in section 2 of this act, with this additional requirement, that they must in their petition specify what city, town, or village, and in what streets thereof, they propose to construct and build said railroad; provided, that no street railroad incorporated under this act shall be constructed within the limits of any incorporated town or city without the consent of the corporate authorities; and provided further, that all such street railroad companies incorporated under this act shall be subject to all just and reasonable rules and regulations by the corporate authorities and liable for all assessments and other lawful burdens that may be imposed upon them from time to time; and provided further, only such of the powers and franchises that are conferred by this act shall belong to said street railroad companies as shall be necessary and appropriate thereto; and in case any street railroad incorporated under this act shall be partly located in an incorporated town or city and partly located in the country, then the provisions of this act which apply to other railroads located in the country shall apply to it so far as that portion of its road is concerned." Acts 1894, p. 69.

Thus the sixteenth section of the act of 1892, which had declared that the act should not apply to and govern in the incorporation, control, and management of suburban and street railroad companies, was stricken out, and the act of 1894 took the place of that section as a part of the general law of the State governing the incorporation of railroads. When the act of 1892 and the amending act of 1894 were codified and incorporated in the Code of 1895, the general laws touching the incorporation and powers of railroads were separated into four divisions. At the beginning of the first division was placed the heading, "Method of Incorporation;" at the head of the second division, "Organization and Capital Stock;" at the head of the third division, "Corporate Powers of Railroads;" and at the head of the fourth division, "Street Railroads." The act of 1894 was included in the fourth division as section 2180 in the Civil Code. As thus codified, the language was the same as that of the act of 1894, except that where the words "said act" or "this act" were there employed, the words, "preceding divisions," or "this division," or "said division," were employed, so that it reads as follows: "All the provisions of the preceding divisions shall govern in the incorporation, control, and management of suburban and street railroad companies, in so far as the same are applicable and appropriate thereto. Any number of persons not less than ten, who desire to be incorporated for that purpose, may form a company as provided in the preceding division, with this additional requirement, that they must in their petition specify what city, town, or village, and in what streets thereof, they propose to construct and build said railroad: provided, that no street railroad incorporated under this division shall be constructed within the limits of any incorporated town or city without the consent of the corporate authorities; and provided further, that all such street railroad companies incorporated under this division shall be subject to all just and reasonable rules and regulations by the corporate authorities and liable for all assessments and other lawful burdens that may be imposed upon them from time to time; and provided further, only such of the powers and franchises that are conferred by said divisions shall belong to said street railroad companies as shall be necessary and appropriate thereto; and in case any street railroad incorporated under this division shall be partly located in an incorporated town or

city and partly located in the country, then the provisions of the preceding division which apply to other railroads located in the country shall apply to it so far as that portion of its road is concerned."

The question arises especially upon the construction of the last clause of the act of 1894, which, as codified, reads as follows: "and in case any street railroad incorporated under this division shall be partly located in an incorporated town or city and partly located in the country, then the provisions of the preceding division which apply to other railroads located in the country shall apply to it so far as that portion of its road is concerned." Bearing in mind that the amending act of 1894 was not a separate and distinct provision, apart from the general law for the incorporation of railroads, but became a part thereof and a section of the act of 1892, what is the proper construction of the clause just quoted? Does it confer upon a street and suburban railroad company, a part of whose line extends into the country beyond the limits of an incorporated town or city, the right to condemn land for a right of way, or does it not? There are three possible constructions which may be given to section 2180 of the Code on the subject of the power to condemn land for a right of way: first, that no power of condemnation at all is conferred upon a street and suburban railroad company as to that part which lies outside of an incorporated town or city; second, that, as to the part of such a road which is located in the country outside of an incorporated town or city, such a railroad stands exactly like a general commercial railroad company in all respects, and has the same power and right of condemnation, and has all the same powers and rights as such a company; and third, that, as to such part of its road, it has a power of condemnation analogous to that of other railroads located in the country, but its exercise is restricted by the nature and character of street and suburban railroad companies, and by what may be necessary and appropriate for such roads; in other words that a street and suburban railroad company, as to that portion of its line which is located in the country, has the power of eminent domain; but that the exercise of such power is limited and restricted by the nature and character of the company, and by what is necessary and appropriate for the use and operation of such a company. If this clause refers to suburban extensions only,

a reasonable, rather than a narrow and restricted, construction should be given to the word "suburban." · Considering section 2180 of the Code in its entirety, so as to give effect to it as a whole, and remembering that it is a part of the general law for the incorporation of railroads, we are of the opinion that the last construction above stated is the reasonable and natural one, and carries out the legislative intent. The statement in the last clause of the section under consideration declares that "The provisions of the preceding division," as to other railroads in the country, shall apply to that portion of a street and suburban railroad which lies in the country. Turning to the preceding division, which is numbered 3 in the code, we find that it includes section 2167, which declares that said railroad company shall be empowered to cause examinations and preliminary surveys to be made; to receive and hold voluntary grants of property; "to acquire, purchase, hold, and use all such real estate and other property as may be necessary for the construction and maintenance of said road, . . and to condemn, lease, or buy any land necessary for its use; to lay out its road not exceeding in width 200 feet," etc. These are among the provisions of "the preceding division," as declared in the code, and are among "the provisions of the act," according to the expression employed in the act of 1894. The provision above quoted from section 2167, which is included in "the preceding division," is the only one which declares that a railroad company shall have or exercise any power to acquire property for the purpose of constructing and operating its railroad. Section 2180 does not in terms confer or declare any such power in regard to a street and suburban railroad company. If it has any such power, it must be by reference to the preceding division of the general railroad law. That law, as already shown, includes in a single sentence the right "to condemn, lease, or buy any land necessary for its use." How can it be said that one mode of acquiring land necessary for the use of the corporation may be exercised by the adoption of "the provisions of the preceding division," and that another can not? It seems to us that to so hold would not be to give effect to the last clause of section 2180.

The Century Dictionary, among other definitions of the word "provision," gives the following: "In law, a stipulation; a rule provided; a distinct clause in an instrument or statute; a rule or

principle to be referred to for guidance; as, the provisions of law; the provisions of the constitution." In the case of State *v.* Lund, 167 Mo. 228 (66 S. W. 1062, 67 S. W. 572), the entire court treated the term "provision" in a constitution or charter as referring to that which was provided by such constitution or charter on the subject in hand. The Judges differed as to whether there was a "contrary provision" to one previously mentioned, included in a charter. The majority of the Judges held that certain expressions in the charter amounted to such "a contrary provision." Robinson, J., dissented. In the opinion filed by him he said: "As applied to legislation, the word 'provision' has the well-understood meaning: 'actual expression in language,'—the clothing of legislative ideas in words, which can be pointed out upon the page and read with the eye; not a conjecture, or a supposition, or an inference drawn from other language referring to a different subject or matter" (p. 255). Whether the opinion of the majority or the dissenting opinion in that case is accepted, the view of either as to the meaning of the term "provision" is sufficiently broad to show that the expression used in the statute now before us would be considered as including the acquirement of property by lease or purchase, or by condemnation, included in the "provisions" of the preceding division.

Cases may be cited to show that there are very material differences between ordinary commercial railroads and street railroads, or street and suburban railroads, and that the conferring of the power of eminent domain generally on "railroads" would not be ordinarily construed as conferring that power upon a street railway, unless there were something to show the legislative intent to do so. Thomson-Houston Electric Co. *v.* Simon, 20 Or. 60 (25 Pac. 147, 10 L. R. A. 251, 23 Am. St. R. 86). Even where a legislative act conferred the power of eminent domain upon a street railway company to condemn property when necessary, it has been held that this did not authorize a general condemnation by it for its line in the city, but that the power would be construed in the light of the character of the corporation and of its business, and limited to condemnation when necessary to carry out its purposes. The case before us differs from the Oregon case, supra, in that here the legislature has declared that the provisions of "the preceding division" touching railroads in the country generally

shall apply to that part of a street and suburban railroad which lies in the country; and the legislative intent is not left to be determined by a construction of the general law for the incorporation of railroads alone.

The change in modern methods of transportation has been very great. Beginning with the omnibus and street hack as modes of public conveyance through the streets of a city, there followed the tramway or horse-car line, then cars drawn by a "dummy engine," and finally the electric car. Street cars, accurately speaking, are cars which traverse the streets of a town or city, and carry passengers, who get on and off at various points along the line. They have been considered as vehicles of street travel; and on this basis they have been declared to create no such additional servitude upon the street as to give a right to damages to owners of abutting land. Within the corporate limits of the city they are subject to reasonable regulations by the municipal authorities. Both by the statute and by the constitution they are required to obtain the consent of the corporate authorities to their use of the streets. Civil Code, § 5782. We need not consider how far the legislature could confer upon them a power of eminent domain other than to use the streets with the consent of the municipal corporation. When the line of such a company is extended beyond the limits of the town or city, it is plain that the provisions of the law referred to touching street railroads within the corporate limits become largely inapplicable. What was the legislative intent as to the status of such portion of the line as should lie without the limits of the town or city? Should no law apply to it, or, if any, what law? The legislature answered this by saying that the provisions touching railroads in the country generally should apply to that portion of the line beyond the town or city. But, construing that legislative declaration in the light of other expressions in the act of 1894, the exercise of the power of eminent domain should be limited by a consideration of the nature and character of the incorporation dealt with; and if it should attempt such an exercise of power as is not appropriate to its nature and character, it would be enjoined.

At the time when the act of 1894 was passed, electrically equipped street railways had not been very long in use; and the extension of such railways beyond the corporate limits and into the suburbs was also of recent origin. Special provisions for the incorporation

of companies to operate such roads, and in regard to the powers and franchises thereof, had not been made. Under the then condition of such enterprises, it was considered sufficient to pass a mere general act, analogizing their extension beyond the corporate limits to railroads generally in the country. Since then, with the growth in the use of electricity as a motive power, the number of such roads has rapidly multiplied, the extensions beyond the corporate limits of towns and cities have greatly increased, suburban extensions have lengthened, and frequently grown into interurban roads. Under the new and changed conditions, we would respectfully call the attention of the legislature to the subject, for which accurate provision should be made. We think that so important a matter should not be left to a mere general act analogizing portions of such roads to railroads in general as far as practicable or proper.

The foregoing part of this division of the opinion expresses the views of all of the members of the court except the writer, upon the subject of the right of the defendant company to condemn private property outside of the limits of incorporated towns and cities. The writer does not concur in such views, but it is his opinion that such company does not possess the power in question; and in support thereof he offers the following:

On December 17, 1892, the General Assembly passed an act to carry into effect article 3, section 7, paragraph 18, of the constitution of this State, in so far as it relates to the issuing and granting of corporate powers and privileges to railroad companies by the secretary of State. The provisions of this act, except what was contained in section 16, are now found in divisions 1, 2, and 3 of article 6, vol. 2 of the Civil Code. Section 16 of the act provided that its provisions should not apply to and govern in the incorporation, control, and management of suburban and street railroad companies. On December 18, 1894, the General Assembly passed an act repealing section 16 of the act of 1892, and substituted in lieu thereof certain provisions which are now embraced in the Civil Code, §2180, which is a part of division 4 of the article above named. If a street or suburban railroad company has the power to condemn land, it must be found in this section, which is as follows: "All the provisions of the preceding divisions shall govern in the incorporation, control, and management of suburban

and street railroad companies, in so far as the same are applicable and appropriate thereto. Any number of persons not less than ten, who desire to be incorporated for that purpose, may form a company as provided in the preceding division, with this additional requirement, that they must in their petition specify what city, town, or village, and in what streets thereof, they propose to construct and build said railroad: *provided,* that no street railroad incorporated under this division shall be constructed within the limits of any incorporated town or city without the consent of the corporate authorities; *and provided further,* that all such street railroad companies incorporated under this division shall be subject to all just and reasonable rules and regulations by the corporate authorities and liable for all assessments and other lawful burdens that may be imposed upon them from time to time; *and provided further,* only such of the powers and franchises that are conferred by said divisions shall belong to said street railroad companies as shall be necessary and appropriate thereto; and in case any street railroad incorporated under this division shall be partly located in an incorporated town or city and partly located in the country, then the provisions of the preceding division which apply to other railroads located in the country shall apply to it so far as that portion of its road is concerned." The law contained in the preceding divisions referred to relates to the incorporation, powers, rights, and franchises of ordinary railroads, one of the powers conferred thereby being the right to condemn private property.

The language in the first part of this section, declaring that the provisions of the preceding divisions shall govern in the "incorporation, control, and management," may not be broad enough to include powers and franchises, within the purview of which latter terms the right of condemnation would fall. If the words quoted are- broad enough to include powers, what is hereinafter said in reference to the words "necessary and appropriate," occurring in this section, is relevant to the words "applicable and appropriate" in the portion above quoted.

A part of section 2180 is as follows: *"and provided further,* only such of the powers and franchises that are conferred by said divisions shall belong to said street railroad companies as shall be necessary and appropriate thereto." The power to condemn is conferred on ordinary railroads in division 3 above referred to,

along with many other powers and franchises.   Section 2180, contained in division 4, says that *only* such of the powers and franchises as are conferred by the preceding divisions shall belong to street railroads as shall . be "necessary and appropriate." The powers and franchises referred to, and conferred on street railroad companies, being restricted to such powers as are necessary and appropriate to them, who is to determine whether or not the power to condemn is a necessary and appropriate power to belong to street railroads?   It would be necessary for the courts to determine this question.   The legislature could confer on the courts the authority to decide that street railroads had the *franchises* given to ordinary railroads in preceding divisions, giving them the right to run on the highways in the county, with the consent of the county authorities, and could confer on the courts authority to decide that street railroads had the right or privilege to buy or lease property for a right of way, and, indeed, that they had any right or privilege (except the power of condemnation), if by the finding of the court such a franchise, right, or privilege was a necessary and appropriate one for street railroads to possess; but the legislature could not confer on the courts the authority to decide whether or not the *power of condemnation* should *belong* to all street railroads because it was one necessary and appropriate for all street railroads to possess.   The writer does not think the legislature would, or could, confer so great a power as that of condemnation in such an uncertain way. as to declare that any class of persons or corporations should have the power if it was necessary and appropriate for them to have it.   The constitution provides that the legislative power is the only one which can delegate for the State to any person or corporation the right to condemn private property. If the legislature provides that street railroads shall have the power to condemn, if necessary and appropriate for them to possess such power, there is no express or definite conferring of this power by the legislature, but it is left for the determination of the courts whether the power of condemnation is one necessary and appropriate for street railroads to enjoy.   The meaning of this section is that *only* the powers conferred by the preceding division shall belong to street railroads as shall be necessary and appropriate thereto; and it is not the meaning of this section that they shall have all such powers, but shall only exercise them when necessary and

appropriate. If this section meant that street railroad companies should have the power of condemnation, but should exercise it only when necessary and appropriate, the general power to condemn would, of course, exist; but the power to condemn can not be conferred by the legislature by providing that a general power of condemnation shall belong to a certain class of corporations if such a power be a necessary and appropriate one for them to possess generally. This would leave it uncertain as to whether the power was granted or not, and the power of condemnation can not be conferred in any such uncertain way. It must be given in express terms, or by necessary implication. In the case of *Markham* v. *Howell*, 33 *Ga.* 508, 511, in speaking of the power of condemnation, the court says: "This is too dangerous and extraordinary power to be conferred by mere implication—it must be expressly granted, and must provide in the grant the mode of compensation, etc." Certainly such power is not conferred in express terms by saying that the power shall belong to a certain class of corporations if such power is necessary and appropriate to them. Nor can it be said that it is necessarily implied when the question as to whether or not the power is conferred is left as a judicial question to be determined by the courts. The judge or jury in trying one case might be of the opinion that it was necessary and appropriate for street railroad companies to have the power of condemnation, whereas another judge or jury, in another case, might be of a different opinion and decide the contrary.

A full quotation of the latter part of section 2180 is as follows: "*And provided further,* only such of the powers and franchises that are conferred by said divisions shall belong to said street railroad companies as shall be necessary and appropriate thereto; and in case any street railroad incorporated under this division shall be partly located in an incorporated town or city and partly located in the country, then the provisions of the preceding division which apply to other railroads located in the country shall apply to it so far as that portion of its road is concerned." If the latter part of the section above quoted means that all of the provisions of the preceding divisions applicable to ordinary railroads, without restriction or qualification, apply to street and suburban railroads in the country, then the right of such street railroads to condemn lands in the country (when located partly in a city and partly in

the country) on one theory would exist. While the latter part of the section above quoted states that the provisions of the preceding division which apply to other railroads located in the country shall apply to street railroads so far as that portion of its road is concerned which is located in the country, when a street railroad is located partly in the city and partly in the country, is this not qualified by the provision immediately preceding, which is that only such of the powers and franchises that are conferred by the preceding divisions shall apply to street railroads as shall be necessary and appropriate thereto? Is it a proper construction of the latter part of this section to say, when a street railroad is located partly in a city and partly in the country, that without restriction or qualification all the provisions of the preceding division, including the provisions relating to powers and franchises, relating to other railroads shall apply to street railroads, so far as that portion thereof which is located in the country is concerned? If this is a proper construction, on one theory the right to condemn would exist, because the right to condemn is one of the provisions of the preceding division which applies to other railroads. But if the provisions of the preceding division which apply to other railroads are qualified by the statement immediately preceding, that only the powers and franchises that are conferred by said divisions shall belong to street railroads as are necessary and appropriate thereto, then the power to condemn would not apply to street railroads unless such power was necessary and appropriate to them. The provisions above quoted, to the effect that only such powers and franchises shall belong to street railroads as shall be necessary and appropriate thereto, are followed in the same sentence by the statement that the provisions of the preceding division which apply to other railroads shall apply to street railroads so far as that portion thereof located in the country is concerned; and it would seem that the restriction that a street railroad should have only such powers and franchises as are necessary and appropriate thereto followed them when they left the city and went into the country.

If, instead of the words "and in case," other words had been used, showing a breaking off from the restrictions immediately preceding and indicating an intention to free what succeeded such words from the qualification preceding, and giving notice that what is then to be said is not to be held to the restriction just

named, the construction might have been different; but the latter part of this section, beginning with the words "and in case," being in the same sentence with what precedes after the word "provided," and being a continuation thereof, the restrictions immediately preceding in the same sentence qualify all provisions in the sentence. These restrictions limit the powers of street and suburban railroads to such as are necessary and appropriate; and, as hereinbefore stated, such powers can not be construed to include the power to condemn private property.

· The legislature, in saying *only* such powers and franchises conferred by the preceding divisions shall belong to street railroad companies as shall be necessary and appropriate thereto, did not say this provision applied to them only in cities and towns, but made this provision applicable to them generally and undertook to state their powers everywhere, whether in cities or towns or country. There is nothing in the statute from which it can be inferred that the legislature intended to name what powers they should have simply in towns or cities. This is the only place in the statute where the legislature undertook to define their powers and franchises. If the legislature had intended to refer to powers and franchises in cities or towns only, it would have so stated. When the statute says in the succeeding words that the provisions of the preceding division which apply to ordinary railroads shall apply to street railroads in so far as their line is concerned which is in the country, the provisions referred to mean provisions outside of those provisions giving powers and franchises, because the act has just named the powers and franchises which they are to have whether in city or town or country. There are many matters outside of powers and franchises in the preceding division relating to ordinary railroads, and it is these other matters to which the provision referred to relates, and not to powers and franchises. The only theory on which the power of condemnation can be said to be given to street railroads when part of their line is in the country, is that *all* the provisions of the preceding division, without qualification, relating to ordinary railroads, shall apply to street and suburban railroads so far as the line of their railroad located in the country is concerned. If this is true, then before they could operate any line which was located in the country, would they have to obtain a charter as an ordinary railroad,

because one of the provisions of the preceding division contains the law providing for the incorporation of ordinary railroads? To give the latter part of the section above quoted this construction, the power of condemnation would not apply to the defendant, because it has never been incorporated under the law as an ordinary railroad and has never ceased to be a suburban and street railroad.

The latter part of the section of the code above referred to does not say that in case any street railroad shall be partly located in an incorporated town or city and *its suburbs* and partly located in the country, but says that in case any street railroad shall be partly located in an incorporated town or city and partly located in the country, etc. Does the word "country" here mean any part of the country, or only such part as is in the suburbs, as distinguished from territory within the corporate limits of a town or city? "Suburb," as defined by the Century Dictionary, denotes "A region or place adjacent to a city; an outlying district of a city; a town or village so near that it may be used for residence by those who do business in the city; in the plural, collectively, environs; surroundings; outskirts; hence, any adjuncts of a place." Whether the word "country" would ordinarily embrace suburbs, its meaning as used in the section quoted includes suburbs, even if the position above assumed is incorrect. The ordinary meaning of a street and suburban railroad is a railroad in a town or city and the suburbs thereof. A railroad could be denominated a street and suburban railroad and could be given the power to run in any part of the country; but unless it appears that it was the intention to give this power, the ordinary meaning of a street and suburban railroad should be given it; and when this meaning is given it, such meaning would be that such railroad would be confined to the city or town and its suburbs. The application for an amendment to its charter granted by the secretary of State, and the allowance of the amendment itself by him, does not show on its face that the property of the plaintiff through which it wishes to run its railroad is in the limits of an incorporated town or city, or the suburbs thereof. His jurisdiction is limited to grant such charters only as the law permits, and to a street and suburban railroad he would have no authority to grant a charter giving it the power to operate outside of both, and the jurisdictional fact that the property of the

plaintiff and others, through which it is to run, is in an incorporated town or city and its suburbs does not appear either in the application for an amendment or in the order of the secretary of State granting the same.

There is no law in this State expressly providing for the incorporation of an interurban railroad to do a passenger business only, as street railroads generally do. The only railroad for which a charter can be obtained to do an interurban business is the ordinary railroad, carrying freight and passengers, with power to use public highways, with the consent of the corporate authorities, and to condemn private property. Under section 2167, in the preceding division, railroads have the right to carry property, receive compensation therefor, and "to do all things incident to railroad business." To hold that the latter part of section 2180 means that a street railroad can run in any part of the country, and that all the provisions of the preceding division apply to it when in the country, would carry with it the right, when in the country, to carry freight and passengers, to leave the public highways, condemn land, and do many other things for which provision is made in the case of ordinary railroads. In other words, it would have the right in the country, right up to the corporate limits of a city or town, to run as ordinary railroads, with all their incidents, powers, and rights. If all the provisions of the preceding division apply, and not such only as are necessary and appropriate, then under Civil Code, §2167, par. 7, such roads, when out of the city, could leave highways, condemn residence lots and go through them, with all their lines operated with engines driven by steam, with all the annoyances incident to noise, cinders, and smoke, to residents in thickly populated suburbs just out of city limits; and there would be no law to prevent this, as the section above quoted absolutely and unqualifiedly gives ordinary railroads this legal right. Ordinary railroads generally want and only have one way through suburbs to a city, but street railroads have many lines, on different highways, in the suburbs; yet under the law, if *all* provisions named apply, they could operate all their lines on the different highways in the suburbs with steam, and there would be no law to stop them from so doing. Municipal authorities could prevent them from doing this in the limits of the city, but there is no authority which could interfere with this right in the suburbs. If all of the provisions

apply as above stated, under par. 9 of the section above named, so far as concerns the road outside of city limits, the time and manner of transportation of passengers and freight, and the compensation charged therefor, would be subject to the control of the railroad commission, though that part of the road in the city at the time this law was passed would not have been under the commission.

The legislature never intended that a street and suburban railroad should consist of a street railroad inside the limits of the city, and when it left such limits it could go through private property in the suburbs and through the balance of the country to other cities and towns, carrying freight cars, and doing "all things incident to railroad business" performed by ordinary railroads. If such was the intention, every time such railroad passed through an incorporated town or city it would be a street railroad, compelled to run on its streets, and between that town and the next it would be an ordinary railroad. In such case, to obviate its being a street railroad, between its termini it would have to go around any intervening cities or towns, because, under the laws of the State and the constitution, it would be a street railroad when it was within the corporate limits of the towns through which it was to pass. Street railroads ordinarily mean surface roads. They do not usually have their rails above the surface so as to impede or inconvenience travel across them by persons or vehicles, even if they could lawfully do so. Street railroads do not impose additional servitude. Damages can not be obtained by owners of land abutting on the streets through which they go. This is not true with ordinary railroads. Street railroads are not supposed to do a regular freight business, as ordinary railroads. They do not impede traffic along the streets or cause congestion, but they relieve passenger traffic and prevent congestion, just as hacks and 'buses do. Their right to run along streets does not depend on the will of the owner of abutting property, but on the will of the city or town authorities. The constitution itself provides: "The General Assembly shall not authorize the construction of any street-passenger railway within the limits of any incorporated town or city, without the consent of the corporate authorities." The kind of railroad intended by this section was the kind named—a street and suburban railroad. When it reached the country, it meant the

suburbs; and while the statute says the provisions applying to ordinary railroads shall apply to street railroads in the country, the restriction preceding still governs, that they shall have only the powers necessary and appropriate. When in the suburbs they have the right to run on the highways, but to do so must get the consent of the county authorities, as would an ordinary railroad. A street railroad is designed mainly to carry passengers from one part of a city to another, stopping at street crossings and other points and picking up passengers here and there, relieving congestion. This design could not well be carried out by having a passenger-train of a street railroad stop at street crossings to carry passengers from one part of an incorporated town to another in towns through which it passed in trying to speed on to other towns and to its final destination. Ordinary railroads generally do not provide a way to convey their passengers on street railroads to another part of the city after they land them in the city. They usually end their obligation and accommodation when they safely land a passenger at their depot or station in the city and afford the passenger a safe way to the street. Nor do they generally carry passengers from any part of a city to their depot or station from which their trains depart. Hence there is no close kinship between the two classes of railroads, and there is no need or desire by one to own and operate the other. The operation or ownership might to some extent conduce to its welfare, but it would be in a very small degree. But the writer does not think it was ever intended by the law referred to that a street and suburban railroad should connect distant points. Unincorporated suburbs are sometimes as densely populated as the city near whose limits they lie, and have highways and cross-highways, just as the city. Are street and suburban railways ordinary railroads in these suburbs, with the right to condemn private property and all of the rights and powers incident to ordinary railroads up to the city limits, to become street railroads with all of these powers, rights, and incidents lost when these suburbs are incorporated into the city, or into a separate municipality? But to hold that *all* of the provisions applicable to ordinary railroads are applicable to street railroads when they are out of the limits of a city or town would make them street railroads when within an incorporated city or town and ordinary railroads when without. The writer does not mean to say that such a cor-

poration could not be created by the legislature; but the intention to create such a corporation is not manifested in the section above referred to, but rather the intention is shown to create a corporation with its railroad on the streets of a city and the *highways to and through suburbs.*  It was intended that street railroads should run only on the streets of an incorporated town or city, as the name "street railroad" indicates, and as provided for in the section above quoted, which says that the streets on which the street railroad shall run must be pointed out in the application for a charter. If the suburbs of a city are not contiguous to the city, they are very near it, and a suburb must be so thickly populated as to insure some travel, or a street railroad company would not want to operate a line to and through it.  A suburb generally has a highway through it to the city limits by the nearest and most practicable route, and along this route would generally be the most practicable and desirable one for a street railroad to run, carrying its passengers to and from the city and portions of the suburbs and space intervening, if there is such space or country intervening. If a suburb is not contiguous to a city, it can not be far away, or it would not be a suburb.  If it is not contiguous to the city, the short distance between having a highway, this highway through the suburbs having residents on its sides would generally make it the most practicable and desirable route for a street railroad to run in order to promote its interests.  Street railroads have usually gone routes and to places thickly populated.  Generally they have not preceded, but followed civilization and populated localities.

The act of 1903 (Acts 1903, p. 38), amending section 2180 of the Code, provides "that nothing in section 2176 of said preceding division, which provides that the general-direction and location of railroads sought to be constructed in this State shall be ten miles from a railroad already constructed or laid out and selected to be constructed, shall be or be held applicable to electric street, suburban or interurban railways, or the selection of the route or the construction of the same."  The law provides for the incorporation of two distinct classes of railroads: one as an ordinary railroad, which is an interurban railroad, and the other as a street and suburban railroad.  But for the passage of this act no interurban railroad could run within ten miles of another when 15 miles from its terminus, but under this act any interurban railroad which

is operated with electricity can run within this distance of another. Here provision is made for an interurban railroad operated with electricity to run in close proximity to another interurban railroad, and it can do the business usually done by street and suburban railroads. An electric street and suburban railroad could likewise run within ten miles of an ordinary railroad when 15 miles from its terminus, when running to or through suburbs situated 15 miles from its terminus. Here provision is made for the two classes of railroads, the street and suburban, or the interurban, to run within 10 miles of another railroad when such interurban or street and suburban railroad is operated with electricity. The defendant in this case has never been incorporated as an interurban railroad. It has only been incorporated as a street and suburban railroad, and its powers and franchises are confined to those given to street and suburban railroads. Until the defendant is incorporated as an interurban railroad, that is, as an ordinary railroad, it can not, *under its charter,* in the opinion of the writer, ever do an interurban business unless an act of the General Assembly is enacted giving street and suburban railroads the right to do an interurban business. It being incorporated solely as a street and suburban railroad under the law distinctly providing for this class of corporations, it can only do a street and suburban business, and the law never intended for the power of condemnation to be conferred on a street and suburban railroad operating on the streets of a city and the suburbs thereof, and over the different highways and cross-highways of the suburbs. Street and suburban railroads operate on the highways and cross-highways of thickly populated suburbs, and the power of condemnation was never intended to be given them in cities, towns, or suburbs. An interurban railroad does not operate, as a rule, on but one highway in a suburb, or city, and it has the power of condemnation everywhere, whether in the city or out of the city. At the time of the passage of the act of 1894, an interurban railroad doing a business such as a street and suburban railroad does was not in the contemplation of the legislature, but an electric railroad doing a business of this kind can operate under the act of 1903 in close proximity to another interurban railroad in going from one city or town to another. To do an interurban business is not a necessary and appropriate business for a street and suburban railroad. The law creates two dis-

tinct classes of railroads and provides for chartering them. As two distinct classes, one is an "interurban," which is an ordinary railroad, and the other is a "street and suburban railroad," and there is no law providing that a street and suburban railroad can do an interurban business. As the power of condemnation can not be conferred except expressly, or by necessary implication, and as the act says that *only* such powers and franchises shall *belong* to street railroads as shall be necessary and appropriate thereto, it can not be said, according to the ordinary rules of interpretation, that this power is conferred expressly, or by necessary implication. The courts would have to decide whether or not such power was a necessary and appropriate power for such railroads to possess. If a railroad possesses the power, authority can be given the courts to decide whether or not in particular instances it is necessary and appropriate for it to exercise it; but authority can not be given the courts *to confer* the power of condemnation by deciding that such power shall belong to a certain class of persons because it is necessary and appropriate *in all instances* for such persons to possess it. The constitution declares that only the legislature can confer such power.

The legislature intended for street railroads to have the right to run on highways to and through suburbs when out of the city or town limits. The writer does not mean to say that they can not leave the highway when in the suburbs, but when they do they must obtain a right of way by some method other than by condemning property. The provisions of law regarding ordinary railroads in the country necessary or appropriate for street railroads in the country shall belong to street railroads in the country. Street and suburban railroads have no more power of condemnation than persons or companies operating hacks, omnibuses, and automobiles for the purpose of taking passengers from one part of the city or suburbs to another.

*Judgment reversed. All the Justices concur. Holden, J., dissents from the ruling in the last division of the opinion.*